### ESTATE OF CHARLES KANAINA, Deceased.

APPEAL FROM HARRIS, C.J.

DECISION RENDERED MARCH 14, 1879. NOT HITHERTO REPORTED.

HARRIS, C.J., JUDD AND McCULLY, JJ.

The Administrator of the Estate of Chas. Kanaina, deceased, brought his accounts to the Probate Court for approval, and asked for a decree of distribution of the remaining property. The Court, by a decision rendered August 17, 1878 (8 Hawn., 623), had, under the Act of 1874, to quiet title in lands claimed by inheritance, decreed the property to certain persons as heirs. New claimants appeared in Probate Court. This decree was pleaded in bar of their claims.

Held, that the said Act of 1874 was contrary to the Seventh Article of the Constitution, which guarantees trial by jury in such cases, and that all proceedings under it were void.

DECISION OF HARRIS, C.J., APPEALED FROM.

First, of Hon. Bernice Pauahi Bishop :

In the opinion of the Supreme Court, filed on the 17th of August, 1878, it is stated that the mother of the deceased was

Kauwa, and his father, Eia; and that Kauwa's mother was Moana, and her father Nohomualani; it is true that many witnesses give the name Palila as the father of Kauwa, which is reasserted by this claimant; and Makue, in her testimony in July, at page 31, testifies that Palila was known under the name of Nohomualani, which he gave to his son, Kahele; and the Court, taking into consideration the books of genealogy which are submitted, and which in the lifetime of Queen Kalama and Kanaina were in their possession, have determined that Nohomualani (k) was the person from whom Chas. Kanaina was descended as his grandfather. I pause to say that the genealogical books above referred to have throughout this investigation had great weight with the Court, because it is certain that they were preserved by Kanaina and Queen Kalama as subjects of interest and importance to them, and appeared to have had their approval. Indeed, it is testified by Manaohia (w) that, on one occasion, Queen Kalama handed her one of the books to correct her impression regarding her own relationship.

Now this claimant, Mrs. Bishop (the Hon. Bernice Pauahi), avers her right by two descents; first, she says that Moana had a husband by the name of Heulu, who had a daughter by the name of Hakau; and if this be true, Hakau would be aunt to the deceased, Chas. Kanaina, by being half-sister to his mother, Kauwa; then this claimant would be entitled to inherit if this Hakau was the mother of Hao by Kanaina the first, and Hao was the father of Luahine, and Luahine was the mother of Konia (w), who in her turn was the mother of this claimant. But she likewise claims by another descent, for she says that Moana had still another husband by the name of Keawe, and that they two had Kanaina the first, which Kanaina would be uncle to the deceased, being half brother to Kauwa, his mother; that this Kanaina the first married his half-sister, Hakau, mentioned above, and had issue as above related.

Now, the question is whether the claimant has proved her descent from Moana by Heulu through Hakau, or by Kanaina through Keawe, or by both of them: since if she has proved

her descent by either one of these she would be entitled to one distributive share as the descendant of one of the uncles or aunts of the deceased ; if she has proved her descent from both of them, she would be entitled to two distributive shares.

It is argued by Mr. Dole that Heulu is not mentioned at all in the former testimony, and that there was another Heulu who was the husband of Ikuana. (See page 3, Exhibit C., Genealogical Book.) Now that the witnesses now before me did not testify to these forefathers, although strongly cross-questioned on two previous occasions, would be of great weight if such should be actually the fact; but referring to the testimony of Makue at page 32, testimony taken in July, we find this statement : The husbands of Moana were Heulu, Kukalohe, Keaweopala and Palila, alias Nohomualani : so that the person on whose testimony the claimant seems mainly to rely to prove her descent from Moana did mention that Heulu was a husband of Moana, in an examination quite independent of this and when the attention of the Court was being directed to entirely another point.

By the genealogical books of Queen Kalama we ascertain, and it may be regarded as a fixed fact, that Kanaina the first had for his wife, Hakau, from whom the claimant descended, as is alleged in the particulars of her claim, so that the only question becomes to be who were the parents of Kanaina (nui) and Hakau. Some stress is laid upon the idea that Makue is recorded to have said that the husband of Luahine, the grandmother of the claimant, was Hooleiopu, whereas by the genealogical book he is Kaoleioku, and Paalua is recorded to have called it Kailipu, and therefore it is argued that they know but little about it. This point is entitled to but little weight, since it may be an error in taking down, and it is impossible almost that this aged woman (Makue), who had lived with these people all her life, should not have known who the husband of Luahine was, which Luahine died only a very few years ago ; and as a matter of fact the Clerk, in taking down the argument of Counsel, notwithstanding the accentuation of this name and its being dwelt upon as a matter of importance, writes it Kolaioku, whereas in the .

genealogical tables it is written Kaoleioku ; and by referring to the Clerk's original rough notes we find it that instead of writing Kailipu, he writes it Kaoliopu.   Now no one supposes that a Clerk who is writing all day long at dictation for many days in succession does not make some error of letters or misapprehension of sounds.

In addition to the testimony of Makue we find (Genealogical Book C., page 2) that Moana cohabited with Keaweopala ; and at the bottom of the same page we find that Moana cohabited with another person whose name is left blank.   This indicates to me that she lived with some person whose name was not at that moment known to the writer, Queen Kalama. It may be asked how I know that the writer was Queen Kalama. Answer : Because I am very well acquainted with her handwriting, and her own name which is just preceding the name of Moana, on the second page, is, without doubt, her own handwriting.

Now the books to which we are referring are not a complete record, nor do they pretend to be, as is evident by referring to page 5 at the top, where the Young family are recorded.   Kekela (Fanny Young) married Naea ; Kamaikui (Mrs. Rooke) is put down, but her husband, Dr. Rooke, is not mentioned ; Keoni Ana (John Young) and his wife Alapai are not mentioned ; Grace Lahilahi is put down, but her husband Kaeo is not mentioned ; Emma, the Queen, is there, and it is not mentioned of what father she is the daughter, and her husband, the King, is not mentioned.   I therefore regard it as proved that the husbands of Moana were Heulu, Keaweopala, Kukalohe, Nohomualani.   I regard it likewise as proved that Keaweopala and Keawe were one and the same persons, and that Palila and Nohomualani were one and the same persons ; and therefore that the stirps from which the claimants of this estate must have descended were

Moana (w) and her  Husbands $\left\{ \begin{array}{l} \text{Heulu,} \\ \text{Kukalohe,} \\ \text{Keawe, and} \\ \text{Palila.} \end{array} \right.$

And whoever has descended from any of these connections is entitled to a distributive share of this estate. Heulu, the first husband in the list, had Hakau (w) by this Moana. Hakau (w) gave birth to Hao (k), and Hao (k) was Luahine's father. Again by Keawe, the third in the above list, Moana had Kanaina the first, who was father of Hao by Hakau aforesaid; in other words Hakau and Kanaina, though man and wife, according to the not unfrequent customs of those days, were children of the same mother. It therefore follows that Luahine, the daughter of Hao and mother of the claimant, Mrs. Bishop, would represent, if alive, two distributive shares in the estate, and therefore this claimant (Mrs. Bishop) is entitled to two distributive shares.

The claim of Maele having been dismissed as well as that of Pamahoa on the testimony hitherto taken, the next claim in order is that of Hannah Lilikalani.

It appears from the testimony that Hannah Lilikalani had a brother, Naihe, who is still alive, and had another brother, Kanihomauole, whose son, Edward Lilikalani, is now living on Kauai; that Kanihomauole was sometimes called Kuakini. Now the testimony seems to be conclusive that Keaweheulu was the father of these three children, Hannah, Naihe and Kanihomauole, or Kuakini, and Kamakau was the father of Keaweheulu. There is one point in this testimony which does not look well. I refer to that of Kaihaakulou (w) who, having been introduced, stated that these children were the children of Aikanaka and the adopted children of Kamakau; and that Kamakau's parents were Kaikailua (w) and Kekea (k), and that she had forgotten the parents of Kaikailua and Kekea; and thereupon Counsel concluded that she was very sick and out of her mind and he would not examine her any farther, but would resume her examination sometime when she was in a better condition. This certainly is not calculated to create a good impression of the validity of the claim. However, the next witness, Pihenui, proceeds to show that Keaweheulu was the father of these children, and says that Naihe died about ten years ago at Napoopoo; whereas the claimant herself, Hannah,

says that he is still alive and is in the Palace yard. This is immaterial except so far as it tends to show a want of knowledge on the part of the witness of the actual condition of his family.

Now this same witness goes on to state that this Kamakau was the father of Keaweheulu; that Kanuha was the father of Kamakau; and that Kukalohe, the second in the list of Moana's husbands, was the father of Kanuha by Moana.

It is worthy of remark here that, in the claim of Levi et al., it seemed to the Court and was so decided, that the Kanuha, who was deputy governor of Hawaii under Kuakini, was grandson of Moana. By this testimony it would appear that Moana had a son by the name of Kanuha; but it does not appear to me to be improbable that she should have a son named Kanuha, and that one of her other sons, to wit, Keholo, should call his son, Kanuha.

Mr. Kaai, who is before the Court representing an adverse interest, states that he has always been informed by his parents and many other persons that these claimants were near relatives of Kanaina; and Kalaaukane testifies that he knew Kamakau and the mother of these three children, Hannah, Edward and Naihe—and that Keaweheulu was the father of the claimants—and he heard it from Keaweheulu that Kanaina the first was his father. It is true that this gives a somewhat different parentage from that given by the claimant herself, who says that Kamakau was the father of Keaweheulu, and that Kanuha was the father of Kamakau. But this is easily reconcilable when it is considered in how indefinite a manner the Hawaiians were accustomed to use, and do now use the word "Makua." It would only be making one brother grandfather instead of the other.

It therefore appears evident to me that the children of Keaweheulu, viz., Hannah Lilikalani, Naihe and Edward Lilikalani, are entitled to one distributive share in this estate; and I do so adjudge.

With regard to Ruth Keelikolani, it appears to me pretty clear that Keawe, No. 3 of Moana's husbands, was the father of Kanaina the first by Moana; that this Kanaina had a son, Kii-

laweau, who was the father of Kekuanaoa, and Kekuanaoa was the father of Keelikolani. This would entitle her to one distributive share.

I adopt the testimony taken before Mr. Justice McCully and reiterated and supplemented before the Full Court, and the conclusions arrived at in the former proceedings in this case, and do adjudge that L. Haalelea (k), Kahuakaiole (k), and A. W. Haalilio (k) are entitled to one distributive share; that Pahau (w) is entitled to one distributive share ; that Kaaua (k) is entitled to one distributive share ; that the heirs of Kilinahe (k) are entitled to one distributive share.

OPINION OF THE FULL COURT, BY McCULLY, J.

The question in its simplest statement is whether the application of the claimants in the Probate Court, upon the final settlement of the Administrator's accounts, to prove a relationship with the deceased intestate, is barred by the proceedings had under the Statute of 1874, to quiet titles in lands claimed by right of inheritance.

There is no language in that Statute which in terms takes away from the Probate Courts any power belonging to or hitherto exercised by them, but it is contended, with good reason, that if the Court in its probate capacity shall admit new parties to make claims, the judgment under the prior proceedings will be affected, and perhaps superseded.

By the judgment which they have obtained, each of four parties is entitled to take one fourth part of the estate.

If one or more parties shall establish in the Probate Court a like relationship and the estate shall be divided into fifths, sixths, or smaller fractions, then the former judgment is *pro tanto* set aside. If a new party shall be admitted and prove that he is a nephew, being nearer than the degree of the above four parties, he will take the whole estate. The former proceedings would have been nugatory and futile. That Statute provides that when proceedings have been regularly had therein, the final decree shall be recorded in the Registry of Conveyances, and may be pleaded in bar of any subsequent action

brought by parties or privies of the original proceedings. It also provides that all who are known to be claimants shall be made parties by notice, and that advertisement shall be made to those who may not be known as claimants to come in to the adjudication.

Those who argue that the former judgment is a bar contend that in view of the public notice, and in view of the fact that the new claimants do not deny notice and knowledge of the former proceeding, they are barred as "parties or privies" from bringing subsequent actions. It is difficult to see how the decree could operate to bar subsequent actions, and so to quiet title upon any other construction, and we therefore take that to be the intention and meaning of the law.

In coming to this conclusion we have been compelled to consider carefully the full scope of the Statute in question, and have had our attention drawn to the following points. First, it is entitled an Act for proceedings to quiet title, but it is limited in the caption to lands "claimed by right of inheritance." It is not therefore a Statute prescribing practice and proceedings in what are known as bills of peace, or bills *quia timet*, for they may be brought to settle other claims than those by inheritance, as for instance, to cure defects in a deed, and in respect to other property than land. This is one of the many departments of Equity jurisdiction. We know of no instance in this country where such a bill has been brought, but there is no doubt that the general Equity jurisdiction given to the Justices of the Supreme Court would be sufficient for it to be entertained, and that the proceedings would be regulated by the rules of Equity practice. Second, the Act contemplates the recovery of land by a party not in actual possession, as against one "holding by deed or otherwise with claim of ownership in fee," and whether the ancestor of the petitioner died testate or intestate, and leaving children and statutory heirs, and Section 7 empowers the Justice of the Court having jurisdiction to issue writs of possession when necessary. Third, the petition is to be heard by the Justice of the Supreme Court to whom it was addressed, or by the Justices of the Circuit Court, with appeal

to the Justices of the Supreme Court. The proceedings are to be had according to the usual course of proceedings in Equity, in the method of taking testimony, that is, by oral or written examinations. They are from first to last to be by Judges sitting without a jury. Fourthly, the decree of the Court bars any subsequent action brought by parties or privies of the original proceedings.

Now in view of the provisions above quoted, we are unable to see why this Statute is not applicable to perhaps all cases which have been the subject of actions of ejectment. It may be used against one holding by "deed or otherwise," that is, by any description of title. It may be used if the ancestor died testate, when the estate is not governed by the Statute of Descent, being devised, and it may be used to claim against the children of one dying intestate.

In the lapse of time all estates may come to be held by right of inheritance or by devise, for some link in the chain of title, so that by this Statute any person, claiming an inheriting relationship to any ancestor who possessed real estate, may bring this Statute to bear on the parties who may now be in possession thereof by devise, by deed or otherwise.

There is no limitation of time in the Statute. The party in possession may have held it for any number of years less than twenty, either by his own occupation after the death of the alleged ancestor, or by deed from an heir. There is nothing in the terms of the law confining it to a case like that before the Court where the estate is in abeyance, all parties who pretend to be related being in such remote degree that they must wait until there shall be some judicial inquest and determination which shall warrant a demand for possession. But if in any case a Statute substitutes a procedure without the possibility of resort to a jury in matters where a trial by jury has hitherto been used, it comes in conflict with the provision of the Constitution found in the latter part of Article 7. "In all cases in which the right of trial by jury has heretofore been used it shall be held inviolable forever except in actions of debt or assumpsit

in which the amount claimed is less than fifty dollars." *In re Paloma*, 4 Hawn., 131.

Heretofore in this Kingdom if B. was in possession of real estate and A. claimed that it belonged to himself by right of inheritance, by devise, by deed or otherwise, he has been obliged to proceed against him in the mode prescribed by Section 1118 of the Civil Code, that is, bring an action of ejectment wherein all the issues of fact are tried by a jury, and the Court makes no judgment and issues no writ of possession not founded on the verdict of the jury. But if this Statute is valid, A. may employ it to eject B. and to bar all other persons afterwards, and B.'s right to a jury as heretofore enjoyed is violated.

The case above supposed is not a remote one. `It comes within the terms of this Act as easily as any case when the party bringing the proceeding is in possession and desires to extinguish hostile claims. We have scrutinized the Act to see if we could separate a part which might have an unconstitutional operation, from the remainder, and if by legal construction the latter could be left operative, but we find that the provision for an action of ejectment is blended throughout with that for quieting the title of a petitioner in possession.

This fact constitutes a vital difference between this Statute and the proceeding which we have spoken of, by bill to quiet title, or bill of peace, and from statutes of other countries having a similar title. We cite from Pomeroy's Remedies and Remedial Rights, Section 369. *Action to Quiet Title* : " The very object of the proceeding assumes that there are other claimants adverse to the plaintiff setting up titles and interests in the land or other subject matter hostile to this. Originally and independent of Statute this particular jurisdiction of equity was only invoked when either many persons asserted titles adverse to that of the plaintiff, or where one person repeatedly asserted his single title by a succession of legal actions, all of which had failed, and in either case the object of the suit was to settle the whole controversy in one proceeding. The action has, however, been greatly extended by Statute, especially in the Western States, and is there an ordinary means of trying a disputed title

between two opposite claimants. The general scope of these statutes is as follows: The plaintiff must be in possession, claiming an estate in the lands. The adverse claimant or claimants must be out of possession, and must assert a hostile title or interest. In this condition the possessor of the land, without waiting for any proceeding legal or equitable to be instituted against him, may come into Court, assert their titles and have the controversy put to rest in the single judgment. It is plain, therefore, that this statutory suit is the converse of the legal action of ejectment."

And we think it is plain that the statute under our consideration in terms provides both for ejectment and the converse result of assurance of title.

We think it would need no argument beyond this to set aside the Statute as unconstitutional and therefore void if the decree were pleaded in bar of proceedings in ejectment. But counsel contend that the Court should not pass upon the question of constitutionality until it is raised in an action where a jury is demanded, and that as the motion to admit claimants in probate does not, at this stage at least, raise the question of a denial of a jury, we should not take notice of that point. We answer that counsel who move for the admission of new claimants have raised the question. It is true the argument on this head was not fully made on either side, upon some expectation that it would not be considered until a case of ejectment should be brought, but we have felt that if the Statute were plainly unconstitutional that we ought not to proceed upon it after the objection was made.

The lengthy proceedings had in this estate under this Statute were had without objection. All parties who came into Court hoped to benefit by them. If the soundness of the procedure was questioned mentally, it was felt that the Act should have a trial, and it was not for the Court *sua sponte* to discard the new remedy which the Legislature had provided. A further experience of its operation discloses the difficulties of confining its use to what might have been the intention of the Legislature. We have before us at the present term another petition brought

under this Statute, *Kapo vs. Mahoe*, where the defendant has been in undisturbed possession of the premises under claim of heirship since. The Justice holding the trial ruled that the defendant was entitled to a jury under ejectment proceedings, yet in terms the Statute applies. At the July Term, 1878, in the matter of the petition of Louis Paloma, to quiet title, etc., the petitioner claimed by a right of inheritance against a respondent in possession, and holding by a title not of inheritance from the petitioner's ancestor. There were some defects in the allegations of the petition, but it might have been brought in the terms of the Statute, that is to say, the Statute applies, but the Court held that as it was a proceeding to eject the respondent not holding as heir, he had a right by Article 7th of the Constitution to a trial by jury. In these cases the Court was not asked to declare the law unconstitutional, as it is in the present case.

If then the Statute is clearly in violation of constitutional guarantee, it is our duty to pronounce it void, and therefore the decree rendered under it is void, and is no bar to the present proceedings.

Plea overruled.